IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GAIL C. WATERS, ) | |
| ) | |
| Plaintiff ) | No. 04 C 3155 |
| ) | |
| v. ) | The Honorable William J. Hibbler |
| ) | |
| K-FIVE CONSTRUCTION CO., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Gail Waters worked for K-Five Construction Company as a semi-dump truck driver from 1996 to 2003. Waters alleges that she was terminated because of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* K-Five moves for summary judgment.

## FACTUAL BACKGROUND

The facts of this case are relatively simple, and largely uncontested. Waters worked for K-Five from 1996 until September 2, 2003, when she was terminated six days after her dump truck trailer overturned. On August 27, 2003, the trailer that Waters had operated overturned while she was dumping her truckload at a dumpsite in Bolingbrook, Illinois. (Def. 56.1(a)(3) Statement ¶ 19). As a result of the accident, Waters was placed on a mandatory three-day suspension while her supervisor, Steve "Butch" Gereg, conducted an investigation of the accident. (Def. 56.1(a)(3) Statement ¶ 21). At the time, Gereg was responsible for determining whether a K-Five driver would be discharged as a result of an accident. (Def. 56.1(a)(3) Statement ¶ 24).

As part of his investigation, Gereg viewed photographs taken shortly after the accident, spoke with witnesses to the accident, and inspected the accident site. (Def. 56.1(a)(3) Statement Ex. A at

1

129-130, 188). Dan Testin, a K-Five mechanic who was called to the scene to upright Waters' trailer, spoke with Gereg regarding the accident. (Def. 56.1(a)(3) Statement Ex. D at 47). According to Testin, when he sat in Waters' truck and looked into the mirrors, he observed that the ground on which Waters had dumped was sloped to the right. (Def. 56.1(a)(3) Statement Ex. D at 47). Testin reported to Gereg that the sloped surface on which Waters had attempted to dump contributed to the accident. (Def. 56.1(a)(3) Statement Ex. A-35). Ramie Formentini, who had been operating a roller at the accident site on the day of the accident, also believed that the ground upon which Waters had dumped was sloped, though it is not clear from the record whether she ever conveyed this belief to Gereg. (Def. 56.1(a)(3) Statement Ex. E at 70-71).

Gereg concluded that Waters should not have dumped her load at the site of the accident because the ground was sloped. (Def. 56.1(a)(3) Statement Ex. A at 132). According to Waters, however, Formentini told her where to dump her load. (Def. 56.1(a)(3) Statement Ex. C at 75, 93). Formentini denied directing Waters where to dump. (Def. 56.1(a)(3) Statement Ex. E at 47-49). Gereg concluded that "no one told Waters where to dump." (Def 56.1(a)(3) Statement Ex. A-26). Gereg further concluded that the dump site was not congested, and that Waters could have chosen another spot to dump. (Def. 56.1(a)(3) Statement Ex. A-26). However, Formentini had informed Gereg that the site was running out of room, and there was only enough room for one truck at a time to enter the site to dump. (Def. 56.1(a)(3) Statement Ex. E at 34-38, Ex. A-36). After completing his investigation, Gereg concluded that Waters' accident was preventable and involved gross employee negligence. (Def. 56.1(a)(3) Statement Ex. A at 133).

When K-Five hired Waters, it gave her its written safety policy guidelines, safety rules, general rules, and work rules. (Def. 56.1(a)(3) Statement ¶ 6). Waters also acknowledged three

times (in 1997, 2001, and 2002) that she received K-Fiver's drivers' manual. (Def. 56.1(a)(3) Statement ¶ 7). K-Five's policy provides that in the event of an accident that is determined to be preventable and involving gross employee negligence, the result is discharge. (Def. 56.1(a)(3) Statement ¶ 10). Gereg decided to fire Waters on September 2, 2003. (Def. 56.1(a)(3) Statement ¶ 42).

Since 1999, five (5) K-Five drivers, including Waters, have been involved in accidents where vehicles have overturned. (Def. 56.1(a)(3) Statement ¶ 51). Gereg investigated accidents involving Angel Kolek, Bruce Dickson, and Tom Tully, all male. (Def. 56.1(a)(3) Statement ¶¶ 52-54). Gereg determined that Kolek and Dickson were at fault for their accidents, that the accidents were preventable, and that Kolek and Dickson were grossly negligent. (Def. 56.1(a)(3) Statement ¶ 56). Both Kolek and Dickson were terminated. (Def. 56.1(a)(3) Statement ¶ 56). Dickson had been disciplined three times previously for minor accidents. (Def. 56.1(a)(3) Statement Ex. A at 62-66). Gereg did not, however, determine that Dickson's fourth accident, for which he was discharged, involved gross negligence. (Def. 56.1(a)(3) Statement Ex. A at 69-70). Kolek also had a previous disciplinary history, receiving several warnings prior to his discharge. (Def. 56.1(a)(3) Statement Ex. A at 173-174).

Unlike Kolek and Dickson, Tully was not terminated. Gereg determined that Tully was not negligent because Tully had recently driven over the ground where the accident occurred without incident. (Def. 56.1(a)(3) Statement Ex. A at 124-25). At the same time, however, Gereg issued Tully a warning letter to Tully informing him that the accident was preventable. (Def. 56.1(a)(3) Statement Ex. A at 127). When pressed for an explanation for how an accident could have been preventable but not involve employee negligence, Gereg could provide none. (Def. 56.1(a)(3)

3

Statement Ex. A at 127-28). Gereg then amended his conclusion regarding Tully's accident, claiming that he did not know why he labeled it as "preventable" and that, in retrospect, it likely was not preventable. (Def. 56.1(a)(3) Statement Ex. A at 127-29).

Gereg also investigated Bob Crane after the ready-mix truck Crane was driving hit a bridge. (Def. 56.1(a)(3) Statement ¶¶ 61, 63). At the time of the accident, Crane was not aware of the height of his mixer. (Def. 56.1(a)(3) Statement Ex. H at 14-15). And although Gereg believed that Crane was responsible for knowing the height of his vehicle, he found that the accident involved employee negligence, but not gross employee negligence, based on Gereg's speculation that the height of the bridge *might* have been mismarked and the fact that he had been given a route by another company. (Def. 56.1(a)(3) Statement Ex. A at 81-84). As a result, Gereg suspended Crane for 10-days. (Def. 56.1(a)(3) Statement Ex. H at 15).

Gereg admitted there are no written criteria that he follows when determining whether an accident was minor or major. (Def. 56.1(a)(3) Statement Ex. A at 72). Gereg also admitted that he followed no written criteria when determining whether an accident was preventable or involved employee negligence. (Def. 56.1(a)(3) Statement Ex. A at 72-75).

## STANDARD OF REVIEW

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ .P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All facts and inferences are viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party opposing

4

summary judgment, however, must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250.

## ANALYSIS

Waters alleges that her gender provided the motive in her termination, and that therefore K-Five violated Title VII when it fired her. A plaintiff may defeat a summary judgment motion in an employment discrimination case by using either the direct method or the indirect method. *Koszola v. Board of Educ. of City of Chi.*, 385 F.3d 1104, 1107-09 (7th Cir. 2004); *Steinhauer v. DeGolier*, 359 F.3d 481, 485 (7th Cir. 2004). Waters makes no argument that she has presented sufficient evidence to proceed under the direct method, and proceeds only under the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct 1817, 36 L. Ed. 2d 668 (1973). Under this approach, Waters must show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) K-Five took an adverse employment action against her; and (4) her employer treated similarly situated individuals outside of the protected class more favorably. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). Once a plaintiff has established a prima facie case, the burden shifts to the employer to come forward with a legitimate, non-discriminatory reason for its actions. *Wyninger*, 361 F.3d at 978-79. If the employer meets this burden, the employee must rebut this explanation with evidence that it is pretextual in order to avoid summary judgment. *Id.*

K-Five does not dispute that Waters is a member of a protected class or that she suffered an adverse employment action. It does, however, argue that Waters was not meeting its legitimate expectations and that Waters has not pointed to a similarly situated employee who was treated more

5

favorably. When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner, the "legitimate expectations" prong of the prima facie test is not necessary to the analysis because the people judging the plaintiff's performance are the same people she accuses of discriminating against her. *Wyninger*, 361 F.3d at 980; *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002); *Curry v. Menard*, 270 F.3d 473, 478 (7th Cir.2001); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 n. 3 (7th Cir.2001). Instead, K-Five's assertions regarding Waters' qualifications should be scrutinized in the pretext analysis. *Curry*, 270 F.3d at 478.

Waters points to two drivers who she believes are similarly situated and who were treated more favorably: Tully and Crane.[1] In disciplinary cases, a plaintiff must show that she is similarly situated with respect to performance, qualifications, and conduct. *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005); *Adams v. Wal-Mart Stores ,Inc.*, 324 F.3d 935, 939-40 (7th Cir. 2003). This normally entails pointing to an employee who dealt with the same supervisor, who were subject to the same rules, and who engaged in similar conduct, without such differentiating or mitigating circumstances as would distinguish their conduct. *Adams*, 324 F.3d at 939-40. K-Five admits that the issue here is neither whether the comparators offered by Waters were similar in their qualifications, nor whether they were supervised by the same person, nor subject to the same rules.

---

[1] In its reply brief, K-Five points out that Crane was disciplined "for a period above and beyond the mandatory 3-day suspension." (Def. Reply Br. at 4). The import of this fact is not clear. Certainly a 10-day suspension, even though it might be greater than the mandatory suspension, is not the same as termination and does not disprove Waters' contention that Crane may have been treated more favorably.

Instead, K-Five argues that the Tully's and Crane's accidents cannot be compared to Waters'.[2] The Court disagrees.

K-Five points to several facts that it believes differentiates Crane's accident from Waters', none of which are convincing. For example, K-Five points out that Crane hit a bridge, whereas Waters overturned her truck. If anything, however, Crane's accident was *more* serious, not less, because his truck was unusable for a much longer period of time.[3] K-Five also argues that Crane had been given a precise route which to drive. But this argument makes little sense because it presumes that Crane had to follow the route, regardless of whether following that route would cause an accident. If Crane had known the height of his truck (as the employee manual required of him) would he still "have had no choice" to follow that route knowing it would damage his truck or would he have been required to pause at the bridge and obtain a new route that he could safely traverse? Crane's accident was caused not because he followed a route given to him by another company, but because he drove his truck under a bridge that was too low for his truck to clear and because he did not know the height of his truck. Furthermore, K-Five ignores completely the fact that Waters

---

[2]K-Five also makes much of the fact that Gereg found that neither Tully nor Crane was grossly negligent, and therefore, their accidents are not comparable to Waters'. But the relevant inquiry in determining whether employees are similarly situated is the *employees' conduct*, not the *employer's assessment* of that conduct. *See Gordon v. United Airlines, Inc.*, 246 F.3d 878, 890-91 (7th Cir. 2001) (Court is not "bound by the labels that an employer uses and must scrutinize the conduct behind those labels to determine if they are applied to similar conduct.")

[3] K-Five argues in its reply that Waters cannot defeat summary judgment by pointing to the amount of damage done in the various accidents because damage was not a factor in Gereg's analysis. K-Five suggests in its point-heading that Waters cannot rely on facts that "were not relevant" to Gereg's decision to terminate her. But K-Five's characterization of the record is inaccurate. Gereg testified only that the damage done was not a *determinative* factor, not that it was not relevant to his inquiry. Furthermore, K-Five's argument poses the wrong question. As noted earlier, the relevant inquiry in determining whether employees are similarly situated is the employees' conduct, not the employer's assessment of that conduct.

testified at her deposition that Formentini instructed her where to dump. Thus, like Crane, Waters was instructed by someone else were to go. The fact that Formentini disputes Waters' testimony is irrelevant on summary judgment, where the facts must be taken in the light most favorable to the non-moving party. Finally, in a last-gasp effort to show that Crane and Waters were not similarly situated, K-Five argues in its reply brief that "it is not uncommon for bridges' heights to be mismarked. (Def. Reply Br. at 4). But this argument also makes no sense. Indeed, if anything, it suggests that Gereg, who admitted that he did not know whether this particular bridge was so mismarked, was willing to *invent* a possible excuse to mitigate Crane's culpability. In other words, it shows that he gave Crane the benefit of the doubt without conducting a factual investigation — attributing an accident to the fact that a bridge *might* have been mislabeled instead of to the known fact that Crane did not know the height of the vehicle he was driving, contrary to his responsibility in the employee manual. The Court finds that Crane, like Waters, was involved in a serious accident and that there are no facts that mitigate or aggravate either's conduct.

K-Five's arguments that Tully was not similarly situated are somewhat more convincing, but Waters has still presented sufficient evidence to show that she and Tully were similarly situated. It is undisputed that Tully had driven over the precise spot where he dumped without incident several times that day. Tully's observation led him to believe that it was safe for him to dump at the spot where he dumped. Although Waters contends that she saw other drivers dumping without incident in the general area where her accident occurred, she testified that had not seen anyone dump at the precise spot where she dumped. Nevertheless, the law is not so narrow as to require identical conduct. *Ezell*, 400 F.3d at 1050. Gereg initially determined that Tully's accident was preventable. But when pressed at his deposition to explain how an accident could be preventable and not involve

employee negligence, he amended his conclusion and suggested that Tully's accident may not have been preventable. Given that both Tully and Waters overturned their vehicles while dumping loads, the Court finds that they were similarly situated, and since Tully was not fired, he (like Crane) was treated more favorably than Waters.

Having established a *prima facie* case of gender discrimination, Waters must now point to sufficient evidence to show that K-Five's reason for terminating her — that she was grossly negligent in causing her accident — was pretextual. Pretext exists where the proffered reason for the employment action is really a lie contrived to mask unlawful discrimination. *Little v. Ill. Dep't. of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004); *Gordon*, 246 F.3d at 888. A plaintiff can make the requisite showing by offering evidence tending to prove that the proffered reasons are factually baseless, were not the actual motivation fo the employment action, or were insufficient to motivate the action. *Gordon*, 246 F.3d at 888-889. If the employee offers evidence from which a finder of fact may reasonably infer that the proffered reasons do not represent the truth, then the case turns on the credibility of the witnesses and summary judgment is not appropriate. *Id.* at 889 (*citing Collier v. Budd Co.*, 66 F.3d at 886, 893 (7th Cir. 1995) & *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1461 (7th Cir. 1994)). In this case, there are several pieces of evidence from which a fact finder could infer that K-Five's proffered reason does not represent the truth.

First, Gereg's explanation of his decision not to fire Tully calls into question his explanation of his decision to fire Waters. Gereg issued Tully a memo informing him that his accident was preventable. (Def. 56.1(a)(3) Statement Ex. A-22). Under K-Five's policy's a "preventable" accident results only in a warning, but an accident that is preventable and caused by gross employee negligence requires termination. At his deposition, Gereg was asked to explain how an accident

9

could be "preventable" and not involve employee negligence. He was unable to do so. In fact, when pressed to explain why he found that Tully's accident was "preventable," Gereg changed his tune and stated "I don't even know why I wrote this letter" and " I suppose [the accident] wasn't [preventable] now that I'm looking at it." (Def. 56.1(a)(3) Statement Ex. A at 127-129). Gereg further admitted that there are no written criteria to guide him in determining whether an accident is major or minor, whether an accident is preventable, or whether the accident involves employee negligence. (Def. 56.1(a)(3) Statement Ex. A at 73-76). Given that Gereg unilaterally decides how to classify an accident, it is more than shocking that not only is he unable to explain what criteria he uses, but that when pressed for an explanation of his assessment of Tully's accident, his assessment of the accident changed. Gereg's inability to explain K-Five's rules and his inconsistent application of them casts doubt on whether he honestly believes the reason for discharging Waters and suggests instead that, at best, his application of the rules is haphazard and subjective, but also that he perhaps uses them as a tool to mask illegal discrimination. *See Gordon*, 246 F.3d at 893 (company's inconsistent definition of misconduct tended to show that proffered reason was a pretext for discrimination).

There is a second reason to doubt Gereg's explanation of his decision to fire Waters. That is that Gereg may have lied about the facts surrounding the accident. In a memo explaining the accident, Gereg wrote that the "dump was not congested." (Def. 56.1(a)(3) Statement Ex. A-26). But Formentini had been asked by Gereg to answer questions regarding the accident, and in response she wrote that they (K-Five operators) "were running out of room" at the dumpsite. (Def. 56.1(a)(3)

Statement Ex. E at K-Five-18).[4] A jury could infer that Gereg lied about the status of the dumpsite in order to make Waters' decision to dump where she dumped seem more negligent. This casts doubt on Gereg's credibility. Further, in the same memo, Gereg writes "[n]o one told Waters where to dump." But according to Waters, Formentini told her where to dump. Certainly, Gereg could have chosen to believe Formentini over Waters, but in his deposition, Gereg testified that he "did not determine why Waters chose that location to dump" and that he "did not believe Formentini over Waters." (Def. 56.1(a)(3) Statement Ex. A at 159). Gereg's memo and his deposition testimony cannot be reconciled, and one of his statements must be false. The fact that a fact-finder could find Gereg to have been less than truthful allows a fact-finder to infer intentional discrimination and thus precludes summary judgment. *Perdomo v. Browner*, 67 F3d. 140, 145 (7th Cir. 1995).

Finally, and perhaps most troubling, is Gereg's attempt to explain his decision not to fire Crane. Gereg offered two reasons why he did not fire Crane: 1) that he was given a route to drive by another company; and 2) sometimes the height of bridges is not identified properly. Both explanations tend to cast doubt on the truthfulness of Gereg's proffered reason for firing Waters. Waters claimed that Formentini told her where to dump. K-Five, however, insists that "[w]hether or not Formentini told plaintiff [sic] where to dump is of no consequence, since Waters had eighteen years of dump truck experience." (Def. Reply Br. at 3). In other words, Gereg (and consequently K-Five) believed that Waters should have relied on her experience and knowledge to avoid the

---

[4] K-Five attaches the deposition Darren DeLisle, who was overseeing the job at the Vulcan job site and who claims that the site was not running out of room. There are several problems with DeLisle's testimony, however. First, DeLisle was *not at* the job site at the time of the accident, so his testimony lacks reliability. Second, DeLisle does not recall if he ever spoke to Gereg about the accident, and so his testimony also lacks relevance. Viewed in the light most favorable to Waters, Gereg had only Formentini's statement that the site was running out of room, and not DeLisle's.

accident *even if* Formentini told her to dump at a location where it should have been obvious that she should not have dumped. And yet, under identical circumstances, K-Five excuses Crane's accident and does not insist that he rely on his experience and knowledge to avoid an accident and ignore instructions to follow a route that was not safe to traverse. Gereg's second explanation as to why Crane was not terminated casts even more doubt on his truthfulness. Gereg admitted that he did not know whether the bridge involved in Crane's accident was mismarked. In essence, Gereg has gone out of his way to *invent* an excuse to mitigate Crane's acts — suggesting that because it was possible that the bridge was mislabeled, Crane was less at fault. Gereg concocted no such hypothetical excuses for Waters. When a rarely used policy is applied in disparate ways, a fact-finder may find the application of that policy to be pretextual. *See Gordon*, 246 F.3d at 892-93. Gereg's efforts to find some way to classify Crane's accident as one that did not involve gross employee negligence call into question his assessment of Waters' accident. Here, Gereg's willingness to create excuses for Crane suggests that he applied a double-standard when assessing Waters' accident.

Waters has produced sufficient evidence to call into question Gereg's truthfulness, and consequently to allow a fact-finder to infer that K-Five's proffered reason for terminating her was pretext. K-Five's motion for summary judgment is therefore DENIED.

IT IS SO ORDERED.

5/20/05
Dated

The Honorable William J. Hibbler
United States District Court